UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Lei Ke,
    Plaintiff,

    -against-                Civil Action No. 17-3230

The Trustees of the University of
Pennsylvania and Arjun Raj,
    Defendants.

**FILED**

**AUG - 1 2017**

KATE BARKMAN, Clerk
By_____Dep. Clerk

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Lei Ke (hereinafter "Plaintiff" or "Ke") complains and in support hereof states as follows:

### NATURE OF THE CLAIMS

1.    This is a discrimination and retaliation case pursuant to the Pennsylvania Fair Educational Opportunities Act ("PFEOA"), based on defendants' refusal to accommodate his vision disability and to retaliate when plaintiff complained to defendants about that. This case also has a cause of action in breach of contract under Pennsylvania law and a cause of action in defendants' violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). Plaintiff seeks a declaratory judgment and injunctive relief for defendants to let plaintiff amend his discriminated grade under the School of Engineering Graduate Student Handbook ("Student Handbook") (Exhibit 7), as well as punitive damages.

### VENUE AND JURISDICTION

2.    Venue is proper in this Court pursuant to Pa. R. Civ. P. 2179.  This Court has jurisdiction over this action under 42 Pa. C.S. § 5301(a)(2),

### PARTIES

3.     At all relevant times herein, plaintiff was a graduate student at the College of Engineering and Applied Sciences.  He resides at 4025 E. Roosevelt Blvd., Philadelphia, Philadelphia County, PA 19124.  At all times relevant to this Complaint, plaintiff had a vision disability, as recognized by UPenn's Office of Student Disabilities Services.

4.     Defendant the Trustees of the University of Pennsylvania ("UPenn") is a Pennsylvania corporation focused on higher education with a principal place of business at 3451 Walnut Street, Philadelphia, Pennsylvania 19104.

5.     At all relevant times herein, defendant Arjun Raj, PhD ("Dr. Raj"), was an assistant professor of bioengineering at UPenn, whose official address is 3451 Walnut Street, Philadelphia, Pennsylvania 19104.

## PERTINENT FACTS

6.     In the spring of 2008, Ke was diagnosed with glaucoma, cataract, peripheral vision loss, double/blurry vision, and partial blindness. His eyes have since undergone surgery twice at Will's Eye Hospital in Philadelphia.

7.     Ke matriculated at UPenn in September 2013 and provided the Office of Student Disabilities Services with his medical records to prove his vision disability, and that office officially recognized his vision disability on September 6, 2013.

8.     From August 2014 through December 2014, Ke took Dr. Raj's BE567 class, which required homework and a large, final project.

9.     Ke orally informed Dr. Raj of his vision disability right at the beginning of the fall semester of 2014.

10.    Dr. Raj stated: "As I repeatedly mentioned in class, performance on the final project factors very heavily in my assignment of a grade."

2

11.     The final project consisting of an oral presentation and a writeup essay.
The presentation was to present to Dr. Raj within five minutes a summary of the
writeup essay.

12.     The final project demanded a continuous use of the computer, and it
heavily involved programming and coding, which would cause Ke's eyes to hurt and
tear up and would compel him to rest his eyes frequently after keeping them on the
computer screen for about twenty minutes each time.

13.     Frequent "breaks" considerably slowed down the process of Ke's working
on his final project and often prevented him from continuing to work on it.

14.     Every time Ke forced himself to keep his eyes on the computer monitor,
the tear-up would lead to red eyes and headache. Then he would be forced to stop work
and rest his eyes. Often he would have to refrain from using the computer for an hour
or two before he compelled himself to return to the computer. Then he would feel his
eyes hurting again to start the same vicious cycle.

15.     At the beginning of the semester, Dr. Raj issued Ke a syllabus, which was
a contract under Pennsylvania contract law. In that contract, Dr. Raj designated Dec. 9,
2014 as the deadline for Ke to complete the final project. (Exhibit 2.) [1]

16.     But orally Dr. Raj told Ke later that the deadline for him was December 1,
2014.

17.     Knowing that he was not able to complete the project by December 1,
2014, Ke emailed Dr. Raj on November 23, 2014 to tell him that he would need more

---

[1] In their 12(b)(6) motion to dismiss, defendants willfully tampered with the syllabus to
remove December 9, 2014 as the deadline and then turned around to accuse plaintiff of
misrepresentation, with the sole purpose to mislead the Court. It is common knowledge that a
syllabus without dates is not a syllabus and a syllabus is not merely a course description. The Court
should sanction such sleazy lawyering conduct under Rule 11.

3

time for computer coding and if he could let him complete the project by December 8, 2014, which was the deadline given to 15 other students of the same class who did not have any disabilities.

18.     Dr. Raj denied Ke access to accommodation and benefits and services provided to students without disabilities.

19.     Ke also orally asked Dr. Raj for an extension, citing his vision disability as the reason and also the fact that he had other courses to take care of.

20.     Dr. Raj flatly refused and said "sorry about that" on Nov. 23, 2014. Ke said that that was not reasonable because the official schedule he had given him said the actual due date was December 9, 2014. (Exhibit 2.)

21.     On the morning of December 1, 2014, Ke emailed Dr. Raj for help. Ke knew Dr. Raj was already fed up with his mentioning of his vision disability. So he only wrote that he had refused Ke's deferment request and that Ke also had to do work on the finals for other classes ("a conflict of scheduling" as Ke wrote) and just could not get the project completed and needed his help in that regard.

22.     Dr. Raj responded 23 minutes later and asked Ke for his phone number, which Ke emailed him. He called Ke and yelled on the phone that Ke must present whatever he had or his grade would be "severely docked." Ke again cited his vision disability as the reason for not being able to finish his writeup as it hampered him from programming and coding on the computer. Dr. Raj yelled on the phone that although he was aware of his vision disability he would not care.

23.     Because Ke insisted that he was not ready to present in class in the afternoon as the presentation depended on the writeup project that was not completed yet, Dr. Raj finally said that Ke must present to him in his office at noon, Wednesday,

4

December 3, 2014 and that Ke must submit his writeup project at the same time or face an "F" grade. Ke said his vision disability might not let him complete the project.

24.     During the week of December 3, 2014, Ke was basically unable to work on his computer for any length of time as his eyes could not stand the computer screen.

25.     On Wednesday (December 3, 2014), after class, Ke followed Dr. Raj to his office and told him on the way that he had done little work on the project because of his vision disability and that he needed more time to complete his writeup project.

26.     In response, Dr. Raj said that Ke was using his vision disability as an excuse to delay his project and that he would likely give him a "C" or even an "F" for the course.

27.     Ke said that he was not delaying the project and that a "C" grade would not be fair because the final grade should be based on the final project, which Dr. Raj had not seen yet. Ke said that he was not asking him to lower his grading standards for him because of his vision disability but that he was only asking him to give him more time to complete the project that he was able to do, but Dr. Raj said that, as the instructor, he had the discretion to do whatever he wanted to with his course.

28.     In his office, Ke said he would like to extend the deadline to December 9, 2014—the deadline as given in the syllabus—but Dr. Raj said he would never agree to that because he had already orally given him an earlier date and he could not give Ke special treatment. Then he looked over Ke's unfinished work and said that Ke must present on his writeup project at 2:45 p.m., Friday, December 5, 2014.

29.     Ke said that he was unlikely to complete the project by 2:45 p.m., Friday, December 5, 2014 because he was hardly able to work on the project because of his eye

5

condition during that week. He would need more time as an accommodation, but Dr. Raj said that that was his ultimatum.

30. Ke tried to force himself to work on the project and do programming and coding on his computer, but he had trouble continuing because his hurting eyes compelled him to stop working frequently.

31. By noon, Friday, December 5, 2014, against his wish and efforts, Ke's writeup project was only two-thirds done. He lived in Northeast Philadelphia, and now he had to bus to Univ. of Pennsylvania to be present in Dr. Raj's office by 2:45 p.m.

32. Although he had not completed his project due to his vision disability, Ke had thoroughly reviewed his project in his mind and was able to successfully present on the content in front of Dr. Raj, but Dr. Raj was mad because Ke's writeup project was not completed.

33. Ke again cited his vision disability as the hurdle and implored Dr. Raj to give him another week or until December 9, 2014—the deadline in the syllabus—to complete his writeup project. (Exhibit 2.) Ke said that he guaranteed that one more week would enable him to complete the remaining one third of the written project.

34. Dr. Raj took offense and said "absolutely not" and ordered, when it was already 3:05 p.m., that Ke's "final writeup must be in [his] e-mail inbox by 5pm and not a minute late!" (Exhibit 4.)[2] Ke said that that was not realistic because coding and programming was not something that could be done in two hours. Indeed, a two-hour accommodation would sound like a mockery of accommodation.

---

[2] Dr. Raj's categorical refusal to accommodate and threat are demonstrated in his email of December 10, 2014. (Exhibits 4-5.)

6

35.     Further, Ke told Dr. Raj that his project materials were all at home in
Northeast Philadelphia and traveling home by bus and subway would take more than
an hour. Dr. Raj said that that was not his problem.

36.     When Ke was leaving his office, Dr. Raj further threatened that this was
"academics" and "in the real world" he "would never tolerate [Ke's] behavior and give
[him] another two hours."

37.     When Ke reached home, it was already past 4 p.m. He had only one hour
left to complete the writeup project and he still had one third undone. He knew he was
facing the impossible.

38.     Having no way out, Ke emailed Dr. Raj the unfinished project at 5:15 p.m.
in order not to further "provoke" him. In the cover email he sent him, Ke wrote: "I know
I could have done a better job if given more time."

39.     Then as though to mock his vision disability, Dr. Raj gave Ke not an "F,"
but a "D-" grade, which did not even exist in the department grading system.[3]

40.     On December 10, 2014, Ke emailed him to ask why he had given him a
"D-" and pointed out: "You had the intention to punish me because you told me in
advance you would do that because I could not timely finish my work due to my vision
disability." Ke told Dr. Raj that he had violated the law.

41.     Earlier on the same day, Dr. Raj had emailed that an unfinished essay
"frankly warranted an F" and that Ke's grade was also due to his "inexcusable degree of

_____

[3] The course cost Ke over $6,000. "D-" was changed to "D" after the Department Chair told
Dr. Raj that the "D-" grade did not exist in the Student Handbook.

7

ongoing lateness," meaning that Ke had kept failing to meet the "deadlines" with a completed writeup project. (Exhibit 4.)

42.     Later, Dr. Raj said that a "D-" instead of an "F" was his way of showing leniency.

43.     Ke explained that his lateness was caused by his vision disability and offered to remediate the writeup project as permitted by the Student Handbook, but Dr. Raj flatly denied Ke's request, stating that remediation was subject to his discretion.

44.     Ke thanked Dr. Raj for his response but said that he had not explained why Ke deserved a "D-" grade. Dr. Raj replied still insisting on Ke's lateness. He emailed on Dec. 11, 2014: "I take lateness quite seriously, especially repeated lateness."

45.     Ke emailed again, but Dr. Raj refused to respond anymore.

46.     The Faculty Handbook provides that "[a]fter there is agreement on the appropriate accommodation [between the student and the Office of Student Disabilities Services], students are encouraged to introduce themselves to professors directly and to initiate a dialogue about their particular needs."[4] That was exactly what Ke did at the beginning of the semester, and that put Dr. Raj to notice of Ke's need for disability accommodation.

47.     The same Faculty Handbook also states with respect to accommodation of students with disabilities: "Allowing students [with disabilities] additional time to complete exams."[5]

48.     While the accommodation letter from UPenn's Office of Student Disabilities Services was not a contract, the Faculty Handbook was, and final projects

---

[4] The language indicates that the Faculty Handbook was also addressed to students.
[5] For graduate students, often exams mean take-home projects.

8

student grades depend on are de facto take-home exams. The language clearly directed Dr. Raj to accommodate Ke by giving him "additional time to **complete** [the final project]," and Dr. Raj deliberately violated that contractual term.

49.     Ke complained about Dr. Raj's disability discrimination and retaliation to the OCR and the PHRC. While the OCR suggested to Ke: "You may have the right to file a private suit in federal court whether or not OCR finds a violation," the PHRC issued Ke the right to sue letter on May 6, 2016.  (Exhibit 3.)[6]

## COUNT I: INTENTIONAL DISCRIMINATION
## IN VIOLATION OF THE PFEOA[7]

50.     Plaintiff incorporates all allegations in this Complaint as if fully set forth herein.

51.     With his vision disability, Ke is an individual with a disability, acknowledged by both UPenn's Office of Student Disability Services and Dr. Raj, who said in his email on December 10, 2014, "I understand that you have a vision disability." (Exhibit 4.)

52.     Ke was qualified to participate in the services, programs, activities, and benefits provided to students with disabilities. Regarding the instant specific situation,

---

[6] The letter directed Ke to "file a complaint in the Court of Common Pleas of [Philadelphia Country]." (Exhibit 3.)

[7] The PFEOA is implemented in the same manner as the PHRA by the same PHRC. The PFEOA covers individual liability. Section 955(e) of the PHRA states that it is an unlawful discriminatory practice "[f]or any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 Pa. Cons. Stat. § 955(e). As to the "named respondent" rule implemented in some courts, the Court of Appeals for the Third Circuit has promulgated an exception to it. In *Glus v. G.C. Murphy Co.*, 562 F.2d 880 (3d Cir.1977), the appeals court outlined a four-part test called the *Glus* factors, which Ke's Complaint has satisfied to make Dr. Raj a defendant under the PFEOA. Further, while there is caselaw stating that courts should not interfere with academic decisions, there is also caselaw holding that once universities discriminate, it is courts' duty to intervene.

9

all he needed was time accommodation, which he had repeatedly asked Dr. Raj to provide with respect to his final project.

53.     The accommodation was available and would cost UPenn or the instructor absolutely nothing, but Dr. Raj refused to accommodate and even repeatedly threatened him with a poor or failing grade because of his asking for time accommodation.

54.     The refusal was willful because Dr. Raj's syllabus clearly stated that the deadline for the final project was December 9, 2014 (Exhibit 2) and that he had the discretion to provide extra time.

55.     It was willful also because (1) UPenn's Office of Student Disability Services provided the letter of accommodation; (2) Dr. Raj acknowledged Ke's vision disability in writing (Exhibit 4); and (3) UPenn's Faculty Handbook clearly contracted him to "[a]llow[] students [with disabilities] additional time to complete exams."[8] *Faculty Handbook. IV.I. Guidelines for Addressing Academic Issues of Students with Disabilities.*

56.     At one point, Dr. Raj told Ke that he did not want to give Ke special treatment by giving him more time to complete the final project.

57.     Defendants willfully denied Ke access to accommodation of time and thereby discriminated against him because of his disability. That was in violation of the PFEOA that prohibits discrimination because of disability.

58.     As a direct and proximate result of defendants' conduct, Ke has been injured and aggrieved. He applied for the PhD program in bioengineering in a number

---

[8] The language does not say "[in-classroom] exams" only. It covers all student exams as the language on its very face indicates—whether they are held in the classroom or in the form of take-home exams/projects.

10

of top universities in 2015, but he was turned down by all of them—including UPenn's PhD program in bioengineering—because of the "D-" grade Dr. Raj had given him.

59.     Despite the clear provisions of the PFEOA that prohibit discrimination because of disability and their acknowledgement of Ke's vision disability and his need for accommodation, defendants persisted in imposing conditions and practices that discriminated against plaintiff by refusing to provide him with time accommodation.

## COUNT II: WILLFUL RETALIATION
## IN VIOLATION OF THE PFEOA

60.     Plaintiff incorporates all allegations in this Complaint as if fully set forth herein.

61.     With regard to accommodation, Ke asserted his right to and asked for it with respect to more time for his final project via email and through oral communications with Dr. Raj. That was protected activity.

62.     On December 10, 2014, Ke directly pointed out in an email to Dr. Raj that his discrimination had violated the law. That was protected activity too.

63.     Instead of giving Ke accommodation regarding the final project, Dr. Raj took offence and told Ke as an ultimatum that he did not have to give Ke special treatment and that his "final writeup must be in [his] e-mail inbox by 5pm [on Dec. 5, 2014] and not a minute late!," whereas he gave more than half of the class who did not have disabilities three more days to complete their essays and whereas his syllabus clearly stated that the deadline for the final project was December 9, 2014. [9] (Exhibit 2.)

_____

[9] On the afternoon of December 5, 2014, Ke implored Dr. Raj to give him one more week or until December 9, 2014—the deadline in the syllabus—to complete the writeup essay involving coding, and Dr. Raj responded that Ke must have his writeup essay in his email inbox by 5 p.m. on

64.     Retaliation was also motivated by Ke's pointing out in an email to Dr. Raj on December 10, 2014: "You had the intention to punish me because you told me in advance you would do that because I could not timely finish my work due to my vision disability." Ke told Dr. Raj that he had violated the law, and that caused him to refuse to let Ke remediate his "D-" grade, as allowed by the Student Handbook—a contract—of the Dept. of Engineering and Applied Sciences, whose specific relevant language provides:

> At the discretion of the instructor, the student can work with the instructor to improve the grade to "C" or higher with additional course work.

65.     (Exhibit 7.) Ke requested such benefit via email, but Dr. Raj flatly denied the request also via email; That was an adverse action too;

66.     The causal connection is proven in two ways. First, Ke was forced to hand in the unfinished essay——"at 5:23" on December 5, 2014, according to Dr. Raj—and Dr. Raj retaliated instantly by giving him a "D-" grade, which was posted online on

---

that day, "not a minute late" (Exhibit 4), even though Ke told Dr. Raj that he could not get it done in just two hours because he would have to bus home to Northeast Philadelphia. As Ke was leaving his office, Dr. Raj yelled: "This is academics. In the real world, I would never tolerate your behavior and give you another two hours!" Such retaliatory intent on the part of Dr. Raj is also directly admitted in his email to Ke:

> The writeup in particular was essentially incomplete and thus frankly warranted an F independent of its untimely submission.

And,

> I did say that I would dock you points for being late, which is of course my right: if you submit an assignment late, I have no obligation to grade the assignment at all.

(Exhibit 4.) This is another direct admission of retaliatory intent as UPenn does not have such policy, as he also alleges that "the grading assessment in my class is at my discretion." (Exhibit 4.) In fact, most faculty would never treat a graduate student with a disability in this manner. The entire issue, as facts demonstrate, is solely based on Ke's being late in completing his final project because of his vision disability, not because he was unable to do the work or he had asked Dr. Raj to lower his grading standards to accommodate him.

12

Tuesday, December 9, 2014–only days later. This suggests retaliation in terms of temporal proximity.

67.     Secondly, Dr. Raj conceded to his "pretext" for failing Ke as he admitted that that was because of Ke's "inexcusable degree of ongoing lateness." (Exhibit 4.) These references Ke's asking him for time accommodation several times regarding the final project.

68.     Thirdly, to punish Ke for his repeated accommodation requests, Dr. Raj even assigned him a grade that did not exist in the Student Handbook, a "D-" instead of an "I" ("Incomplete"), which ought to be the right grade as thus defined in the Student Handbook: "The mark of "I" is used to designate an Incomplete." (Exhibit 7.). Ke did not complete his final project because of his vision disability, and Dr. Raj conceded in Exhibit 4 that "The writeup in particular was essentially incomplete." Dr. Raj later changed the "D-" grade to "D" when told by the department chair that the "D-" grade did not exist in the Student Handbook. (Exhibit 6.)

69.     So Dr. Raj willfully retaliated against Ke for asserting his rights under the PFEOA by asking for accommodation because of his vision disability and by protesting discrimination.

## COUNT III: BREACH OF CONTRACT UNDER PENNSYLVANIA LAW

70.     Plaintiff incorporates all allegations in this Complaint as if fully set forth herein.

71.     In Pennsylvania, while students in public colleges are protected by the US Constitution, students in private colleges/universities are not and therefore handbooks of private colleges are always considered as contracts, as corroborated by this caselaw:

13

The courts have held that in general, the basic relationship between a student and a private university or college is contractual in nature. The catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant become part of the contract. Questions of discipline, academic matters, and tuition and scholarship disputes have been addressed by courts and resolved on contract principles.

*Barr v. Cmty. Coll. of Beaver Cnty.*, 968 A.2d 235, 238 (Pa. Cmmw. Ct. 2009)

(Emphasis original).

72.    Given this, defendants breached the contracts that were (1) UPenn's Faculty Handbook, (2) Dr. Raj's syllabus distributed in class at the beginning of his course, and (3) the Student Handbook.

73.    UPenn's Faculty Handbook clearly provides that faculty must accommodate students with disabilities by "6. **Allowing students additional time to complete exams**." *Faculty Handbook. IV.I. Guidelines for Addressing Academic Issues of Students with Disabilities.*

74.  ˙  By categorically refusing to accommodate Ke for one more week of "additional time to complete" his final project in the nature of a take-home exam on December 5, 2014, Dr. Raj breached that contract.

75.    Additionally, at the beginning of the fall semester of 2014, Dr. Raj issued Ke a syllabus, which was a contract of adhesion under Pennsylvania law, as it is construed strictly against the party formulating it. In that contract, Dr. Raj designated Dec. 9, 2014 as the deadline for Ke to complete the final project. (Exhibit 2.)

76.    On December 5, 2014, Ke asked Dr. Raj to provide him with another week or until December 9, 2014—the date specified in the syllabus—to complete his final project because of his vision disability, but Dr. Raj categorically refused. That was a breach of his own syllabus.

14

77.     As a contract, the Student Handbook has a grading scale in terms of

assigning GPA values. There is no "D-" grade on the scale (Exhibit 6), but Dr. Raj

assigned Ke a "D-" grade just for asking him for an extension of another week or until

the deadline in the syllabus—December 9, 2014—to complete his final project. That was

a breach of the Student Handbook as the "correct" grade—which would nevertheless be

discriminatory—ought to be an "I," as thus defined in the Student Handbook: "The

mark of "I" is used to designate an Incomplete." (Exhibit 7.) Ke did not complete his

final project because of his vision disability, and Dr. Raj conceded in Exhibit 4 that "The

writeup in particular was essentially incomplete."

## COUNT IV: VIOLATION OF THE UTPCPL

78.     Plaintiff incorporates all allegations in this Complaint as if fully set forth

herein.

79.     The statutory liability of educational services purchased with tuition and

fees is actionable under the UTPCPL.[10]

80.     The three breaches as described in the previous count are also actionable

under the UTPCPL because of defendants' deceptive conduct that caused plaintiff harm

when he had justifiably relied on their contracts of adhesion as he believed that they

were valid, credible, and trustworthy.

---

[10] The Pennsylvania Supreme Court has recognized the viability of a UTPCPL claim to
recover tuition and fees in an educational setting. *See Meyer v. Community College of Beaver
County*, 2 A.3d 499 (Pa. 2010). Outside Pennsylvania courts, UTPCPL claims arising from the
statutory liability of educational services purchased with tuition and fees have been permitted to
proceed in at least three federal actions: *Dillon v. Ultrasound Diagnostic Schools*, Nos. 96-8322, 97-
1268, 97-6477, 1997 WL 805216 (E.D. Pa. December 18, 1997); *Harris v. Saint Joseph's University*,
No. 13-3937, 2014 WL 1910242 at *7 (E.D. Pa. May 13, 2014); *Sibeto v. Capella Univ.*, No. 2:13-CV-
1674, 2014 WL 3547344 (W.D. Pa. July 17, 2014). All these cases show that the purchase of
educational services for personal profit upon graduation is not a bar to the plaintiff's UTPCPL
claims.

15

81.     First, defendants' Faculty Handbook[11] promised: "6. **Allowing students**

**additional time to complete exams**." *Faculty Handbook. IV.I. Guidelines for Addressing*

*Academic Issues of Students with Disabilities*,[12] but in reality, on December 5, 2014,

the Trustees of the University of Pennsylvania refused to implement the clause of their

own formulation—through their agent Dr. Raj—by **willfully** refusing plaintiff an

extension of a week to complete his final project by way of accommodating his vision

disability. That made defendants' contractual promise in the Faculty Handbook

deceptive in character.

82.     Secondly, at the beginning of the semester, Dr. Raj issued Ke a syllabus,

which was a contract of adhesion under Pennsylvania contract law. In that contract,

Dr. Raj designated Dec. 9, 2014 as the deadline for Ke to complete the final project.

(Exhibit 2.) But on the afternoon of December 5, 2014, when Ke implored Dr. Raj to give

him one more week or until December 9, 2014—the deadline in the syllabus—to

complete the writeup essay involving coding, Dr. Raj willfully refused, making the final

project deadline in his syllabus—formulated by himself—a deception.

83.     Thirdly, the Student Handbook has a grading scale in terms of assigning

GPA values. There is no "D-" grade on the scale (Exhibit 6), but Dr. Raj fabricated a D-

grade to discriminate and retaliate against plaintiff for asking for accommodation

---

[11] Which was also addressed to students, as evidenced in ¶ 45 above.

[12] Defendants have argued that the letter from the Office of Student Disabilities Services
said only: "50% more time for in class tests and quizzes" in order to write off the Faculty Handbook,
but that is red herring simply because the letter does not legally control the Faculty Handbook but
only the opposite would be true. In fact, in the wake of the "D-" grade, plaintiff talked to a vice
president of UPenn, who suggested that plaintiff ask the Office of Student Disabilities Services to
persuade Dr. Raj to let him remediate the grade, but that office was not willing to do that and
expressed that should plaintiff have required earlier that it put in the letter the language that
plaintiff was to have extra time for take-home exams/projects, it would have done so. Of course, the
Faculty Handbook's language "Allowing students [with disabilities] additional time to complete
exams" speaks for itself, regardless of what the letter from the Office of Student Disabilities Services
says.

16

because of his vision disability and for pointing out that Dr. Raj's discrimination violated the law. Because Dr. Raj conceded in Exhibit 4 that "[t]he writeup in particular was essentially incomplete," the "correct" grade ought to be an "I," as thus defined in the Student Handbook: "The mark of "I" is used to designate an Incomplete." (Exhibit 7.) Thus tellingly, his fabrication of the nonexistent "D-" grade was motivated to punish Ke and was nothing short of deceptive conduct.

84.     All of these three violations pertain to the statutory liability of educational services actionable under the UTPCPL, and specifically defendants' deceptive conduct violated (1) 73 P.S. § 201-2(4)(iv): "Using deceptive representations...in connection with goods or services"; (2) 73 P.S. § 201-2(4)(xiv): "Failing to comply with the terms of any written guarantee or warranty given to the buyer ... after ... the purchase of ... [educational] services ..."; and (3) 73 P.S. § 201-2(4)(xxi): "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," this last part being the well-known catchall provision.

85.     Plaintiff justifiably relied on the Faculty Handbook, Dr. Raj's syllabus, and the Student Handbook, believing that defendants had no reason or intention to and would never depart from the contracts formulated by themselves until they suddenly betrayed the contractual terms of their own making to cause irreparable harm to plaintiff, putting a "D-" grade in his official student transcript to ruin his reputation and career and rendering him inadmissible to the PhD program in bioengineering in any of the top universities he applied to including the PhD program in his own department at UPenn.

17

86.     Defendants' violation of the UTPCPL is a highly colorable cause of action because of their deceptive conduct that goes beyond the mere breach of contract under Pennsylvania law. Here the gist of the action doctrine would never apply because deceptive conduct causes this count to sound in tort rather than contract and defendants' deceptive conduct has caused harm to plaintiff's liberty and property interests as promulgated and protected by the Constitution of the Commonwealth of Pennsylvania.

### RELIEF SOUGHT

**WHEREFORE**, plaintiff respectfully requests that this Court:

A.     Declare that defendants the Trustees of the Univ. of Pennsylvania and Dr. Arjun Raj willfully discriminated against plaintiff by refusing to accommodate him with an extra week of time on December 5, 2014 because of his vision disability in violation of the Pennsylvania Fair Educational Opportunities Act, 24 P.S. §§ 5001-5010.

B.     Enjoin defendants from continuing discriminatory practices against students with disabilities.

C.     Enjoin defendants from any future discrimination and retaliation against students with disabilities.

D.     Order defendants to make plaintiff whole by allowing him an opportunity to amend his "D-" grade by allowing him to work on a project with a different professor—as partially in accordance with the specific relevant language of the Student Handbook (Exhibit 7)—to earn a fair grade to replace the "D-" grade.

E.     Order defendants to let Ke exercise his right under the Family Educational Rights and Privacy Act of 1974 (20 U.S.C. § 1232g) to place in his education record a statement commenting on the challenged grade—unless the

18

challenged grade is expunged from the record.  This statement will be maintained as part of Ke's education record as long as the contested portion is maintained. Whenever a copy of the education record is sent to any party, the statement will be included.

F.    Order defendants to pay punitive damages for their intentional conduct as described above in the amount of $500,000. And

G.    Grant such further relief as the Court deems necessary and proper in light of the public interest.

**JURY DEMAND**

Plaintiff requests a jury trial on all claims set forth herein.

Respectfully submitted,

Lei Ke
4025 Roosevelt Blvd.
Philadelphia, PA 19124
814-218-6905

**VERIFICATION**

I, Lei Ke, duly certify and state that I am the plaintiff in the above captioned case and make this verification that I have read the Amended Complaint and state that the facts contained therein are all true and correct to the best of my knowledge, information, and belief. I make these statements subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

Lei Ke
4025 Roosevelt Blvd.
Philadelphia, PA 19124
814-218-6905

19

## CERTIFICATE OF SERVICE

The undersigned certifies that he has served a true and correct copy of the foregoing document, via first-class mail, to defense counsel Leslie M. Greenspan at Ten Penn Center 1801 Market Street, Suite 2500 Philadelphia, PA 19103, this August 1, 2017.

Lei Ke
4025 Roosevelt Blvd.
Philadelphia, PA 19124
814-218-6905

20

Jump to Today

## Course Syllabus

BE567 Syllabus

Course title: Modeling Biological Systems

Course instructor: Arjun Raj

This course will cover topics in systems biology at the molecular/cellular scale. The emphasis will be on quantitative aspects of molecular biology, with possible subjects including probabilistic aspects of DNA replication, transcription, translation, as well as gene regulatory networks and signaling. The class will involve analyzing and simulating models of biological behavior using MATLAB.

The course will be largely lecture-based with occasional discussions of recent literature from the field. We will cover some aspects of molecular biology, but will focus primarily on a more quantitative viewpoint than a traditional molecular biology course. We will also cover the development of new experimental methods (including imaging and sequencing) and how researchers are using them to generate a more quantitative picture of molecular biology.

We will assume a working knowledge of basic molecular biology as well as some background in math (including calculus and linear algebra, though mostly some elementary probability), although the motivated student will likely be able to catch up through reading and working through the assignments. Many of the assignments (assigned roughly every other week) will involve analytical and computational analysis of models of molecular biology, with the goal of relating these insights to experiments in molecular biology. These assignments will require familiarity with MATLAB programming and will often involve some form of probability or statistics.

Throughout the course, students will develop a final project, in which they research a particular aspect of molecular biology that they find interesting, formulate a quantitative question about it, analyze that question either analytically or computationally, and then write a short research paper connecting their results to the literature. Additionally, students will have to give a 10 minute presentation to the class about their project.

Grades will be based on performance on the HW, final presentation, and class participation. There are no assigned texts for the course, although I encourage students to read through:

Molecular Biology of the Cell (Bruce Alberts et al.) (most important)

An introduction to systems biology (Uri Alon) (less important)

Topics may vary depending on class interest, but may include:

- A quantitative view of DNA replication, including:
  - Basic numbers
  - Implications for cancer biology
- A quantitative view of gene expression, including:
  - Basic numbers
  - Stochastic effects in gene expression
  - Tools for simulating gene expression/Gillespie's algorithm
- Experimental methods in quantitative biology, including:
  - Imaging methods, super-resolution microscopy
  - Single cell methods
  - Explanation and interpretation of sequencing methods
- Gene networks, including:
  - Quantitative models of gene networks
  - Experimental observations of new facets of gene function.
  - Bacterial chemotaxis
  - Network motifs

Exhibit 1

- Topics in evolutionary dynamics, including:

  o Experimental observations of evolution.

| Date | Details | |
|---|---|---|
| Wed Sep 10, 2014 | Pre-readings/work for group work on 9/10 (https://canvas.upenn.edu/courses/1256392 /assignments/4620014) | due by 11:59pm |
| Fri Sep 12, 2014 | Homework 1 on Luria Delbruck (https://canvas.upenn.edu/courses/1256392/assignments/4620011) | due by 5pm |
| Fri Oct 3, 2014 | Homework 2 (https://canvas.upenn.edu/courses/1256392/assignments/4639639) | due by 11:59pm |
| Mon Oct 13, 2014 | HW 3 (https://canvas.upenn.edu/courses/1256392/assignments/4643791) | due by 11:59pm |
| Fri Oct 31, 2014 | HW4 on transcriptional bursts (https://canvas.upenn.edu/courses/1256392/assignments/4651589) | due by 11:59pm |
| Wed Nov 5, 2014 | Final project proposal (https://canvas.upenn.edu/courses/1256392/assignments/4658452) | due by 11:59pm |
| Tue Dec 9, 2014 | Final project presentation (https://canvas.upenn.edu/courses/1256392/assignments/4689984) | due by 11:59pm |
| | Questions ahead of group work this Wednesday, 10/29 (https://canvas.upenn.edu/courses/1256392 /assignments/4665964) | |

Exhibit 2

Exhibit 1



**COMMONWEALTH OF PENNSYLVANIA**
**Human Relations Commission**
**333 Market Street, 8th Floor**
**Harrisburg, PA 17101-2210**
**(717) 787-4410 voice**
**(717) 787-7279 TTY**
**www.phrc.state.pa.us**

**May 6, 2016**

**Lei Ke**
**4025 Roosevelt Boulevard**
**Philadelphia PA 19124**

**RE:   Lei Ke vs. University of Pennsylvania**
**Case No. 201403138 & 201402879**

**Dear Lei Ke:**

**The Pennsylvania Human Relations Commission (Commission) has completed its review of your Request for a Preliminary Hearing. Based upon that review, the Commission voted to deny your request at its April 25, 2016 Commission meeting on the grounds that you presented no facts or evidence not considered at the time of the original finding or no facts or evidence that would alter the original finding.**

**As a result of this decision, the Commission has closed your case. You have no further appeal rights with the Commission.**

**You are reminded that pursuant to Section 12(c) of the Pennsylvania Human Relations Act, 43 Section 962(c), you have the right, upon the dismissal of your case, to file a complaint in the Court of Common Pleas of the county where the alleged unlawful discriminatory practice took place. If you desire to do this, and have not already done so, you should file the complaint as soon as possible. You may also wish to consult a private attorney about this right and about any other rights you may have in this matter.**

**Very truly yours,**

**JoAnn L. Edwards**
**Executive Director**

5b Deny – NPC – C

Exhibit 3



Lei Ke <theleike@gmail.com>

## Re: My grade.

Arjun Raj <arjunraj@seas.upenn.edu>                                     Wed, Dec 10, 2014 at 8:17 AM
To: Lei Ke <theleike@gmail.com>
Cc: Jason Burdick <burdick2@seas.upenn.edu>, Kathleen Venit <kvenit@seas.upenn.edu>, "S. Sonya Gwak"
<sgwak@seas.upenn.edu>

Dear Lei,

Thank you for your note. I am here CCing Dr. Jason Burdick, Bioengineering Graduate Group Chair, Kathleen Venit,
Graduate Program Coordinator, and Dr. Sonya Gwak, Director of Student Life at Penn Engineering for reference.

Yes, I am happy to provide a reason why I gave you a D- for BE567, which in no way is retaliation or punishment for
your vision disability. As I mentioned in class, the grading assessment in my class is at my discretion, and largely
depends on performance in class, performance on the 4 assigned HWs, and the final project, which consists of an in
class presentation and a project writeup in scientific paper format. Firstly, your grades on the HWs were lower than
everyone else's in the class. This is even independent of the fact that of the 4 homeworks assigned in class, you
turned in the last two over a week late, and at least one of them without any prior notice whatsoever. However, this
poor performance and tardiness is not the only reason for your low grade. As I repeatedly mentioned in class,
performance on the final project factors very heavily in my assignment of a grade. I will now outline the circumstances
surrounding your final project.

I first spoke of the final project on the first day of class, and assigned the final project proposal on 10/27, due 11/5, and
returned feedback on 11/10 or 11/12. Once I returned the feedback, there was no reason not to begin work on the
project. I assigned dates for the presentation on 11/16, and your date for presentation was 12/1 (the other date was
12/8). I believe this is more than ample time to finish the final project, and no other student had a problem with this,
except the one you mention, who had a very severe extenuation circumstance that I independently verified with their
advisor. You had asked for a deferment for one week, but by the time you asked, it was very close to the final
presentation dates, and having already set the times for presentation, I felt it would be unfair for me to force another
student to move their presentation from 12/8 to 12/1. You suggested that you could ask if another student in the class
willing to trade spaces with you, which I said was fine. Nobody was willing to do so, which is of course their right.
Nevertheless, I will now describe how I did in fact grant you an extension and your handling of the situation.

I received an e-mail from you on the morning of Monday 12/1 saying that you were unable to complete the
assignment. To ask for an extension at such a late time is simply inexcusable. I immediately sent you an e-mail
asking for your phone number and then gave you a call to discuss, which we did. I did say that I would dock you
points for being late, which is of course my right. If you submit an assignment late, I have no obligation to grade the
assignment at all. We then spoke after class. I asked you if you could present on Wednesday, and you said that you
would try, but couldn't promise that you would have it done. So I went further and allowed you to present at 2:45pm
on Friday, 12/5, on the condition that everything was complete by the time of our meeting. I was then surprised to see
that you had barely even begun your writeup at all, despite my having repeatedly asking you to have it complete at our
earlier meeting. Nevertheless, I listened to your presentation and then gave you an explicit directive that your final
writeup must be in my e-mail inbox by 5pm and not a minute late. I received your writeup at 5:23. Irrespective of the
content of your final project, this is an inexcusable degree of ongoing lateness, and despite my giving you ample
accommodations, you were still late.

As to the content of your talk and proposal, I'm sorry to say that it did not meet the bare minimum standard of the
class. The talk and writeup were very vague and there were clearly fundamental, major errors in your underlying
model based on the discordance between two different simulation methods. The writeup in particular was essentially
incomplete and thus frankly warranted an F independent of its untimely submission.

I understand that you have a vision disability. As determined by the Learning Disabilities Center at Penn (see

Exhibit 4

attached), you are entitled to Extended test-taking time, 50% for in-class tests and quizzes.  This of course does not apply to the issues we are discussing here, since there were no in-class tests and quizzes in my class.  Despite that, I believe I have gone far beyond what is required in accommodating your situation, allowing late homework and giving you ample extra time on your final project.

I am not sure what the procedure is for appealing a grade, but if there is such a mechanism, it is of course your right to invoke it.  As I understand it, I am under no obligation whatsoever to "let [you] redo the essay and give [you] as much time as [you] need", as you are suggesting.  If you wish to discuss this with me further, I am happy to do so, but will only do so in the presence of the graduate group chair and potentially any other relevant parties.

Sincerely,
Dr. Raj
[Quoted text hidden]



**DisabilityLetter.pdf**
19K

Exhibit 5



Table of Contents

GRADUATE PROGRAMS

ACADEMIC REQUIREMENTS

ACADEMIC OPTIONS

GRADUATE GROUPS

REGISTRATION PROCEDURES

BILLING AND TUITION

STUDENT CODE OF CONDUCT

GRADUATE STUDENT FORMS

# Graduate Student Handbook

## Academic Standing Requirements

To remain in good academic standing, graduate students are required to maintain a minimum GPA throughout the graduate program and make satisfactory progress toward their declared program.

Master's students are required to maintain a minimum GPA of 2.7 at the end of every semester, and must be completing the appropriate courses in accordance with their degree program, as agreed upon with his/her assigned Faculty Adviser.

Ph.D. students must maintain a minimum GPA of 3.0 at the end of every semester. In addition, they must be making satisfactory progress toward the degree, including taking courses as approved by the assigned Faculty Adviser, and satisfactorily passing/completing requirements such as the Qualifying Exams and the Dissertation proposal.

Students not making satisfactory academic progress may receive a warning or be placed on probation. In the absence of improvement in the subsequent semester, students on warning or probation may be dropped from their program.

There is a minimum cum GPA of 3.0 to increase registration max above 4 CUs for master's students.

### GRADING SCALE
The grading scale is as follows:

| A+ | A | A- | B+ | B | B- | C+ | C | C- | D+ | D | F |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 4.0 | 4.0 | 3.7 | 3.3 | 3.0 | 2.7 | 2.3 | 2.0 | 1.7 | 1.3 | 1.0 | 0.0 |

**The Pass/Fail option is NOT permitted for graduate students.** The mark of "S" is used to indicate Satisfactory performance and the mark of "U" is used to indicate Unsatisfactory performance in a course taken as master's thesis research (597) or dissertation research (999). The exception to the 597 grading applies only to Computer and Information Science students.

No course may be retaken/re-registered to improve a grade of "C" unless the content is different. (Students may, with instructor's permission, do additional work to improve this grade, however). Graduation may not be postponed for grade improvement if all other graduation criteria are met.

Exhibit 6

Case 2:17-cv-03230-LDD  Document 11  Filed 08/01/17  Page 27 of 27

If a grade of "D" or "F" is received in a core or required course, which prevents graduation, the student has three options (Effective FA02 class):

1. At the discretion of the instructor, the student can work with the instructor to improve the grade to "C" or higher with additional course work.
2. At the discretion of the instructor, the student can retake the course by attending the course again (in a subsequent term) without registering or paying additional tuition, and will receive a grade change if earned.
3. If instructor does not agree to either (1) or (2), the student's only option is to register and pay tuition for the course again. Upon successful completion of the retake with the same instructor, the original registration will be changed to "withdraw" with the instructor's permission . [Thus the original course and grade will not be counted toward graduation or GPA; i.e., SEAS will not allow the course to be counted twice toward the degree.]

## INCOMPLETES, NR (NO REPORT), AND FAILURES

The mark of "I" is used to designate an Incomplete, "NR" for No Report (no grade submitted), and "GR" (student was not present in class though enrolled). These marks will remain as permanent grades until a Change of Grade is submitted by the instructor of the course for the completion of the requirements.

Master's students will be permitted to graduate with a failure, "F" grade but must attain all course requirements. An "F" grade will not count towards the course requirements (Effective FA98 class). No grade lower than a "C-" will be counted in courses designated as "core" courses or those courses must be retaken.

Exhibit 7